**DOMESTIC FABRICS
CORPORATION,
Plaintiff,**

v.

**SEARS, ROEBUCK & CO., Defendant.**

**No. 4:00–CV–127–H(4).**

United States District Court,
E.D. North Carolina,
Eastern Division.

Sept. 15, 2003.

Richard F. Landis, II, Wallace, Morris & Barwick, Kinston, NC, David E. Ben-

nett, Coats & Bennett, Raleigh, NC, Anthony J. Biller, Coats & Bennett, Cary, NC, P.C. Barwick, Jr., Wallace, Morris, Barwick, Landis, Braswell & Stroud, Kinston, NC, Larry L. Coats, Coats & Bennett, PLLC, Cary, NC, for Domestic Fabrics Corporation, plaintiff.

Mark Allen Davis, Womble, Carlyle, Sandridge & Rice, Raleigh, NC, Michael E. Ray, Womble Carlyle Sandridge & Rice, Winston–Salem, NC, for Sears, Roebuck & Co., defendant.

## ORDER

HOWARD, District Judge.

This matter is before the court on plaintiff's motion for summary judgment on the issue of damages concerning the infringement of patent no. 5,636,533, (" '533") for a thermal/jersey fabric. The defendant has responded. On July 17, 2003, this court entered an order granting the parties ten days to supplement any prior submissions on the issue of damages. The court has received said supplemental memoranda; thus, these matters are ripe for adjudication.

### *STATEMENT OF THE CASE*

By order filed on July 17, 2003, the court denied defendant's motion for a new trial; its motion to withdraw its stipulation as to liability; its motion seeking to withdraw its stipulation withdrawing its affirmative defenses of invalidity and unclean hands; and, its motion to reassert the affirmative defenses of patent invalidity and unclean hands. In so ordering, the court also vacated the portion of its prior order entered on March 11, 2003, which entered final judgment on the issue of liability/infringement. The court also lifted the stay in this litigation, thereby barring the defendant from an interlocutory appeal of the issue of liability/infringement to the Federal Circuit Court.

With the defendant's stipulation concerning liability/infringement based on Magistrate Judge Louise Flanagan's interpretation of the patent claims,[1] the court must now consider the plaintiff's motion for summary judgment which seeks a determination as to damages.

The court takes this opportunity to note that during its disposition of the defendant's motion to reopen discovery, it discussed the propriety of defendant's latest affirmative defenses of patent invalidity and unclean hands. Although the discussion was had in the context of a motion to reopen, the same analysis would apply were Sears to assert these affirmative defenses on summary judgment. Specifically, in its order, filed July 17, 2003, the court held:

1. This court adopted the following interpretation of the patent claims at issue, which *a priori* leads to a finding of infringement:

   [T]he '533 patent is for a composite, double knit fabric having two layers, referred to as the "inner layer" and the "outer layer," which are terms of reference to distinguish the two layers of fabric. The term "inner layer" refers to the layer of the fabric with the air pockets. The term "outer layer" refers to the layer opposite the inner layer. The term "air pockets" as used in the '533 patent means voids.

   *Domestic Fabrics Corp. v. Sears, Roebuck, & Co.*, 212 F.Supp.2d 489, 508 (E.D.N.C.2002).

Defendant acknowledged as much in its brief in support of summary judgment, filed with the court on July 20, 2001, which stated that "when the structure of an accused product is undisputed, as is the case here, the entire infringement issue collapses into the issue of claim interpretation, a question of law for the Court amenable to summary judgment." (Def. Mem. In Sup. Sum. Judg. at 2.) Thus, whether based on the defendant's stipulation concerning infringement, or the court finding infringement as a matter of law, it is clear from the record that based on this court's claim construction, Sears has infringed plaintiff's '533 patent.

Title 35 U.S.C. § 102(b) invalidates any patent which is in public use or on sale more than one year prior to the date of the patent application. This determination is a question of law. *Monon Corp. v. Stoughton Trailers Inc.*, 239 F.3d 1253, 1257 (Fed.Cir.2001). "Public use" is defined as "any use of [the claimed] invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor." *In re Smith*, 714 F.2d 1127, 1134 (Fed.Cir.1983). The prior invention which is alleged to have been in use must also be the "embodiment" of the claimed invention at issue. *Juicy Whip, Inc. v. Orange Bang, Inc.*, 292 F.3d 728, 737 (Fed.Cir.2002). However, experimental use negates a finding of public use. *Baxter Int'l, Inc. v. Cobe Labs., Inc.*, 88 F.3d 1054, 1059 (Fed.Cir. 1996).

To make a showing of prior sale, a party alleging invalidity must prove (1) that the product was the subject of a commercial sale or offer for sale and, (2) that the invention was ready for patenting. *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998). Finally, to satisfy the burden of presenting clear and convincing evidence of prior public use or sale, a party presenting oral testimony must also present documentary corroborative evidence of the use or sale. "[U]ncorroborated oral testimony by interested parties is insufficient as a matter of law to establish invalidity of [a] patent." *Lacks Ind., Inc. v. McKechnie Vehicle Components USA, Inc.*, 322 F.3d 1335, 1350 (Fed.Cir. 2003).

Sears presents the following evidence in support of its allegations of prior use: (1) Mr. Clayborne's statements; (2) the 1985 Spec Sheet; (3) the testimony of the expert Dr. Little; and, (4) the testimony of Mr. Miller along with the Finishing Sheet concerning the production of the fabric. The court does not find this evidence to be clear and convincing or sufficient to overcome the presumption of patent validity. Taking the evidence in the light most favorable to the defendant, i.e. that the fabric embodied in the '533 patent was previously designed and manufactured by the plaintiff in 1985, this is not evidence of public use; nor is it evidence of a prior sale. The fact that the 1985 fabric was "probably" finished into a sellable product, according to BN Miller, is insufficient to support a finding of a prior sale or commercial use. The only evidence presented by the defendant of a prior sale is Mr. Clayborne's declaration which states that he believes the fabric in the 1985 spec sheet was finished into fabric used to make Nautilus athletic wear. Once again, without corroboration the court is unwilling to invalidate the '533 patent.

More importantly, none of this evidence can be taken to support Mr. Clayborne's assertion of inventorship. First, the 1985 spec sheet was unsigned. Though Domestic Fabrics conceded during oral argument that the spec sheet was in fact in Mr. Clayborne's handwriting, plaintiff also highlighted that it was Mr. Clayborne's job to fill out such spec sheets. Thus, the fact that he entered the numbers on the sheet does not lead to a determination that he came up with the process or patentable basis for the spec sheet.

Second, Mr. Clayborne's statements are not corroborated. He admitted that he wrote the specs on the 1985 sheet, after he had set the machine to create the fabric. It seems improbable that he conceived of this revolutionary new fabric without first documenting it prior to attempting to set the machine to create it. Furthermore, Mr. Miller's finishing sheet is dated before the 1985 spec sheet. According to Mr. Miller, it was

customary for finishing sheets to be dated after the spec sheet, thus this discrepancy serves to undermine the credibility of Mr. Clayborne's assertions. Mr. Clayborne's assertion of inventorship is uncorroborated oral testimony, in that the 1985 spec sheet does not support his assertions that he invented the fabric and is dated after the finishing sheet. As uncorroborated oral testimony, it fails as a matter of law to support a finding of invalidity. *See Lacks Ind., Inc.,* 322 F.3d at 1350.

Third, Mr. Clayborne made no mention of his inventing this fabric at any time prior to his termination in October 2001. The timing of Mr. Clayborne's statements are highly suspect and concern a matter that occurred in 1985. The court is persuaded that "uncorroborated oral testimony, particularly that of interested persons recalling long-past events, does not, of itself, provide clear and convincing evidence required to invalidate a patent on [the grounds of prior public knowledge or use]." *Woodland Trust v. Flowertree Nursery,* 148 F.3d 1368, 1371 (Fed.Cir.1998).

### STATEMENT OF THE FACTS

Domestic Fabrics Corporation is located in Kinston, North Carolina, and designs and manufactures fabric. Sears, Roebuck and Company is a large scale retailer which sells garments and other products. In 1996, Mr. Fred Hunneke and Mr. Uli Marker began the patent application process for the '533 patent as the stated inventors. On June 10, 1997, the '533 patent was issued by the USPTO.

The events which underlie this dispute began in 1998, when Sears imported shirts under the Canyon River Blues label from a foreign manufacturer. On December 22, 1998, the plaintiff sent a letter to Sears concerning the possible infringement of the '533 patent. (Pl.Sum.Judg.Ex. A.) The letter alleged that Sears' Canyon River Blues line of clothing incorporated fabric embodied in the '533 patent. It also asked Sears to cease the manufacture and sale of the Canyon River Blues line, unless the parties were able to decide upon an alternative disposition to the issues, such as a reasonable license agreement. Sears' attorneys responded to Domestic Fabrics by letter dated February 19, 1999, which stated the following:

> We have thoroughly analyzed the patent and compared our client's fabric to its disclosure as much as possible without having the assistance of a high powered microscope or other means for analyzing the fabric weaving.

> We presume you conducted an analysis before asserting this patent infringement claim against our client... [P]lease provide to us a claim chart which applies the claims of your client's '533 patent to our client's fabric so we may better understand your infringement claim... [ . . . ]

> We look forward to receiving the foregoing analysis from you and reaching a resolution of this matter as well.

(Def.Resp.Sum.Judg.Ex. G.) Before receiving an answer from Domestic Fabrics, Sears conducted its own in-house analysis and responded to the plaintiff by letter dated March 19, 1999, as follows:

> As mentioned in our letter of February 19, 1999, we are unable to view our client's fabric with the assistance of a high-powered microscope or other means to analyze the fabric weaving. As a result, we engaged the services of Sears' Laboratory to produce a drawing of our client's fabric in order that we could better consider the fabric with respect to the '533 patent.

> In fact, we understand that a Sears technician literally traced Fig. 1 of the '533 patent for purposes of more easily making a comparison to the disclosure in the '533 patent. She then

made appropriate modifications believed to be representative of the weave in our client's fabric. Therefore, the enclosed drawing is not an accurate representation of the actual fabric but is believed to serve a useful purpose for analyzing your claim of infringement.

With the foregoing qualifications, we have thoroughly compared the enclosed drawing representative of our client's fabric to the '533 patent and do not believe our client's fabric infringes claim 1 of the '533 patent for at least the following reasons. First, [...] the stitches in [Sears' fabric] in adjacent wales are not "staggered with respect to each other..." [Second], [Domestic's fabric contains] air pockets [that] are seven courses in length and two wales wide... [T]he air pockets in our client's fabric are much wider as a result of the repeating pattern of stitches discussed above.

Furthermore, although not analyzed by an expert, there is a good possibility that our client's fabric does not even have tuck stitches, a critical limitation added to claim 1...

(Pl.Sum.Judg.Ex. E.) It was later determined that the fabric technician referred to by Sears in the letter was Karen Mueser. During her deposition testimony, Ms. Mueser stated that she did not explicitly state to anyone at Sears that it was her opinion that the Canyon River Blues fabric did not infringe the '533 patent. (Mueser Depo. p. 41–42.) She also stated that she was not an expert in this type of analysis and felt uncomfortable being the sole opinion on the issue. (*Id.* at 32–35.)

For eleven months, there was no communication between the parties. Between November 1999 and February 2000, Sears ordered a final shipment of the Canyon River Blues line, as well as entering into three other contracts using the same fabric under the Trader Bay and Classic Elements trademarks. Domestic Fabrics alleges that the delay was not an acquiescence on its part. Rather, Domestic Fabrics was attempting to secure a third party analysis of the patent claims, which is difficult to do in this technical field.

Communication began again on February 23, 2000, when Domestic Fabrics wrote Sears concerning its continued belief that the Canyon River Blues line infringed the '533 patent. This letter, however, included an analysis by Vartest Laboratories, a third-party, which determined that the fabric used in Canyon River Blues was virtually identical to that embodied in the '533 patent. (Def.Resp.Sum.Jud.Ex. J.) The letter further stated:

Earlier, Sears took the position that its tuck stitches in adjacent wales are not staggered with respect to one another. Based on the above knitting charts, that cannot be the case. [...]

[B]ecause the knit constructions are essentially identical, there must be infringement in this case. [...]

As we discussed in the past, our client would desire to meet with you and an appropriate representative or representatives of Sears and attempt to explore a reasonable resolution of this matter that would be beneficial to both Domestic Fabrics and Sears.

(*Id.*)

In April 2000, Sears contacted Dr. Trevor Little, an expert in the field, to conduct an analysis of the fabrics. However, Sears did not authorize Dr. Little to conduct the fabric analysis until June 8, 2000. Domestic Fabrics alleges that after the February 2000 letter, from May 2000 through October 2000, Sears entered into approximately three more contracts to import infringing materials.[2] (Vilas–Fors-

---

2. Contract Nos.: (1) 2491, entered into 5/15/00 (for two product lines); (2) 2539, en- tered into 7/7/00 (for two product lines); and,

berf Aff. Ex. A.) The plaintiff further alleges that Sears did not remove any of the previously infringing material from the marketplace, but rather continued its sale of those items.

On August 10, 2000, prior to Dr. Little completing his analysis, Domestic Fabrics filed suit in this action alleging willful infringement of the '533 patent. Within one month, the parties began settlement discussions. These discussions continued through at least March 2001. Though the parties were not able to come to a resolution of this litigation, there were several communications between the parties concerning possible licensing agreements and royalty rates[3] as well as the possibility of future business between the plaintiff and the defendant.

However, plaintiff challenges the defendant's sincerity during this negotiation period. According to Domestic Fabrics, "the actions of Domestic Fabrics were unilateral because Sears never reciprocated an offer of settlement, but only delayed, claiming it was having difficulty coordinating the schedules of its buyers. Sears then dictated that any settlement would be only for the purpose of negotiating a future one year contract and that Domestic Fabrics would have to agree in advance that Sears would pay no monetary damages for its past and ongoing infringing activities." (Pl. Sum. Judg. Reply p. 6.)

The parties dispute what the reasonable royalty should be in this action. Plaintiff seeks a royalty rate of "8% of Sears' *list retail price* for its infringing garments. The total value of the infringing garments, valued at Sears' list retail prices was $10,477,878.00. This yields a total royalty due of $838,230.00." (Pl.Sum.Judg. p. 15.) Plaintiff bases this percentage on a report created by Dr. Stephen E. Margolis. (Margolis Aff. Ex. A ¶ 23.) Dr. Margolis based his conclusion on "the premium paid in an actual sale of fabric sold by Domestic Fabrics as compared with a price for nonproprietary textile products," information he gathered from interrogatories and discovery documents. The report also stated that the reasonable royalty, "[e]xpressed as a percentage of the retail or list price, the premium that is due to the enhanced value of the fabric that [...] is 3.41%." However, later on Dr. Margolis explains his 8% figure as reflective of the "evidence of a market premium for the '533 patented goods over standard goods, Domestic Fabrics' status as an unwilling licensor [i.e. that they would prefer to manufacture the fabric themselves and sell it directly], Domestic Fabric's interest in establishing the premium nature of the product in the marketplace," and, "Sears' markup to full retail prices." (*Id.*)

Sears questions the completeness of this report, citing several factors which Sears claims Dr. Margolis failed to include in his analysis. Sears contends that 8% of the list retail price is a very high royalty rate. Sears, however, has not submitted its own expert analysis on a reasonable royalty. Rather, Sears merely presented evidence of a prior fabric licensing agreement which set the royalty rate at 6.5% of the *average sales price.* (Def.Resp.Sum.Judg.Ex. V); and (McCormick Decl. ¶ 2). Sears also attempts to rely on the royalty rates discussed by the parties during settlement

---

(3) 2725, entered into 10/4/00 (for two product lines).

**3.** During the course of settlement discussions, plaintiff asked for a 6% royalty rate on Sears' current sales, as well as discussions concerning possible future business, on January 25, 2001. (Def. Resp. Sum. Judg. Ex. O, p. 5 of 12.) Later, also in the context of settlement negotiations, plaintiff proposed a 4% royalty rate and a future business relationship as a reasonable settlement offer. (Def.Resp.Sum.Judg.Ex. Q.)

negotiations as examples of a reasonable royalty in this case. *See* fn. 3 *supra.*

## DISCUSSION

### I. Standard of Review

Summary judgment is appropriate pursuant to Fed.R.Civ.P. 56 when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has met its burden, the non-moving party may not rest on the allegations or denials in its pleading, *see Anderson,* 477 U.S. at 248, 106 S.Ct. 2505, but "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (*quoting* Fed.R.Civ.P. 56(e)).

In making this determination, the court must view the inferences drawn from the underlying facts in the light most favorable to the non-moving party. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. *See Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505. Accordingly, the court must examine "both the materiality and the genuineness of the alleged fact issues" in ruling on this motion. *Faircloth,* 837 F.Supp. at 125. Thus, for Domestic Fabrics to succeed on summary judgment, it must show that no material disputes exist concerning the facts which underlie its determination of the reasonable royalty.

## II. Damages

### A. Reasonable Royalty

Generally, a finding of damages in a patent infringement action is a question of fact, with the burden of proof resting on the patent owner. *See SmithKline Diagnostics, Inc. v. Helena Labs. Corp.,* 926 F.2d 1161, 1164 (Fed.Cir.1991). A reasonable royalty is defined as "damages adequate to compensate for infringement." The patent statute sets the reasonable royalty rate as a floor, not a ceiling to damages. 35 U.S.C. § 284 ("but in no event less than a reasonable royalty"); *and Rite–Hite Corp. v. Kelley Co.,* 56 F.3d 1538, 1554 (Fed.Cir.1995). The reasonable royalty calculation is used when the patentee is unable to prove lost profits. If the record is devoid of evidence fixing the "established royalty" in the field, then the fact finder may determine the reasonable royalty based on "hypothetical negotiations" between the patentee and infringer. *Mahurkar v. C.R. Bard, Inc.,* 79 F.3d 1572, 1579 (Fed.Cir.1996). Courts caution, however, that when the two parties were not willing or able to come to an amicable resolution, other factors must be analyzed to avoid the "perception that blatant, blind appropriation of inventions patented by individual, nonmanufacturing inventors is the profitable, can't lose course." *Fromson v. Western Litho Plate & Supply Co.,* 853 F.2d 1568, 1575 (Fed.Cir.1988). A detailed list of all pertinent factors used to determine a reasonable royalty have been set out in *Georgia–Pacific Corp. v. United States Plywood Corp.,* as follows:

1. The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.

2. The rates paid by the licensee for the use of other patents comparable to the patent in suit.

3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.

4. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

5. The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.

6. The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed [* *8] sales.

7. The duration of the patent and the term of the license.

8. The established profitability of the product made under the patent; its commercial success; and its current popularity.

9. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14. The opinion testimony of qualified experts.

15. The amount that a licensor (such as the patentee) and a licensee (such [* *9] as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention— would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

318 F.Supp. 1116, 1120 (S.D.N.Y.1970); *see also Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1109 (Fed.Cir.1996). Finally, if the court finds that the reasonable royalty rate would not adequately compensate the patentee, it may award a higher rate. *See King Instruments Corp. v. Perego*, 65 F.3d 941, 951 (Fed.Cir.1995).

■ Domestic Fabrics has tendered substantial evidence through its expert, Dr. Margolis, of a reasonable royalty rate of eight percent (8%) of retail price of the infringing garments.

Sears, however, has tendered no expert analysis showing what it believes constitutes a reasonable royalty. Instead, Sears has attempted to deny the reasonableness of the eight percent (8%) royalty and to question the credibility of Dr. Margolis, Domestic Fabric's expert. They have pre-

sented no credible evidence that shows the eight percent (8%) royalty to be unreasonable.

Under Federal Rule of Civil Procedure 56(e), the

> adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate shall be entered against the adverse party.

Sears has failed to meets its burden of coming forward with evidence to create a reasonable question of fact. Therefore, there is no genuine issue of material fact for trial. Domestic Fabric's motion for summary judgment is granted.

Domestic Fabric's expert analysis of a reasonable royalty is reasonable under the factors outlined in *Georgia–Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. at 1120. Also, this court notes that "reasonable royalty" is the floor for damages in this type of action, and this court is authorized to award a higher rate if it finds that the reasonable royalty would not adequately compensate the patentee. *See King Instruments*, 65 F.3d at 951.

### *CONCLUSION*

For the foregoing reasons, the court GRANTS the summary judgment motion of plaintiff, Domestic Fabrics. Plaintiff is entitled to recover from defendant $838,230, plus interest from the date of entry of judgment at the federal post-judgment interest rate until paid.

This court also grants plaintiffs thirty (30) days from the entry of this judgment within which to present this court with a post-judgment motion for attorney fees, enhanced damages, and prejudgment in-

terests. This grant includes the right to present a showing of willfulness and any other showing required to succeed on such motion.

As to the various motions to strike, the court finds, in light of the fact that summary judgment is being granted in favor of Domestic Fabrics, none of the motions to be sufficiently meritorious and such motions are hereby deemed moot.